UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STEPHEN AND LINDA MAUS, parents of
a disabled child, K.M.,

                      Plaintiffs,

        - against -

WAPPINGERS CENTRAL SCHOOL
DISTRICT AND SUPT. RICHARD
POWELL, in his official capacity,

                      Defendants.

**MEMORANDUM OPINION
AND ORDER**

05 Civ. 5160 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiffs Stephen and Linda Maus, on behalf of their minor child, K.M.,

bring this action against Defendants Wappingers Central School District and

Superintendent Richard Powell under the Individuals With Disabilities Education Act

("IDEA"), 20 U.S.C. §§ 1400 et seq., Section 504 of the Rehabilitation Act of 1973, 29

U.S.C. § 794, and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §

12131 et seq.  Pursuant to IDEA, Plaintiffs appeal from the decision of a New York State

Review Officer ("SRO") denying K.M.'s classification as a student with a disability

under IDEA, and denying Plaintiffs' request for tuition reimbursement for their unilateral

placement of K.M. in a private school for the latter half of the 2003-04 school year.

Pursuant to Section 504 of the Rehabilitation Act and the ADA, Plaintiffs claim that

Defendants failed to provide K.M. with an appropriate plan or reasonable

accommodation as required by these statutes.

Plaintiffs have moved for partial summary judgment on their IDEA claims, while Defendants have moved for summary judgment on all of Plaintiffs' claims. For the reasons stated below, Defendants' motion is GRANTED, and Plaintiffs' motion is DENIED.

## BACKGROUND

## I.    STATUTORY FRAMEWORK

Congress enacted IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).  The term "children with disabilities" includes children with various physical impairments as well as children with a "serious emotional disturbance."  20 U.S.C. § 1401(3)(A).  "Under the IDEA, 'states receiving federal funds are required to provide "all children with disabilities" a "free appropriate public education."'"  R.R. ex rel. M.R. v. Scarsdale Union Free Sch. Dist., 615 F. Supp. 2d 283, 287 (S.D.N.Y. 2009) (quoting Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 107 (2d Cir. 2007) (quoting IDEA, 20 U.S.C. § 1400(d)(1)(A))).  "A free appropriate public education ('FAPE') must provide 'special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits.'"  Id. (quoting Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998)).

A school district administers special education services through the development of an "individualized education program" ("IEP") for each disabled child. 20 U.S.C. § 1414(d).  In New York, local committees on special education ("CSE") are

responsible for developing appropriate IEPs.  Walczak, 142 F.3d at 123 (citing Heldman v. Sobol, 962 F.2d 152 (2d Cir. 1992)).  A CSE is also responsible for determining whether a child should be classified as eligible for educational services under IDEA. Parents who believe that the state has failed to provide their child with a free appropriate public education "may, at their own financial risk, enroll the child in a private school and seek retroactive reimbursement for the cost of the private school from the state." Gagliardo, 489 F.3d at 111 (citing Sch. Comm. of the Town of Burlington v. Dep't of Educ., 471 U.S. 359, 370 (1985)).  "Parents 'may present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child.'"  See N.C. ex rel. M.C. v. Bedford Cent. Sch. Dist., 473 F. Supp. 2d 532, 535 (S.D.N.Y. 2007), aff'd, 300 F. App'x 11 (2d Cir. 2008) (quoting 20 U.S.C. § 1415(b)(6)).  "The parents involved in such a complaint 'shall have an opportunity for an impartial due process hearing.'"  Id. (quoting 20 U.S.C. § 1415(f)).

In New York, these hearings are conducted before an Independent Hearing Officer ("IHO"), who is appointed by the local board of education.  See id.  The IHO's decision may be appealed to an SRO, and the SRO's decision may be challenged in either a state court of competent jurisdiction or in federal court.  See id.  (citing 20 U.S.C. § 1415(i)(2)(A)).

The statutory purpose of the Rehabilitation Act is similar to that of IDEA, but the Rehabilitation Act is broader in scope. See Muller ex rel. Muller v. Comm. on Special Educ. of the E. Islip Union Free Sch. Dist., 145 F.3d 95, 100 n.2 (2d Cir. 1998). The Rehabilitation Act provides that "no otherwise qualified individual with a disability

in the United States . . . shall, solely by reason of her or his disability, be excluded from

the participation in, be denied the benefits of, or be subjected to discrimination under any

program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  "The

definition of 'individual with a disability' under Section 504 of the Rehabilitation Act is

broader in certain respects than the definition of a 'child with [a] disability' under the

IDEA." Muller ex rel. Muller, 145 F.3d at 100 n.2.  For example, "Section 504's reach

extends not only to individuals who in fact have a disability, but also to individuals who

are regarded as having such a disability (whether or not that perception is correct)."  Id.

A student could therefore qualify for accommodations under Section 504 of the

Rehabilitation Act and yet not be entitled to special education services under IDEA.

       Both the Rehabilitation Act and the ADA protect disabled persons from

discrimination in the provision of public services.  In similar terms to those used in

Section 504 of the Rehabilitation Act, the ADA declares that "no qualified individual

with a disability shall, by reason of such disability, be excluded from participation in or

be denied the benefits of the services, programs, or activities of a public entity, or be

subjected to discrimination by any such entity."  42 U.S.C. § 12132.  "Apart from the

Rehabilitation Act's limitation to denials of benefits 'solely' by reason of disability and

its reach of only federally funded – as opposed to 'public' – entities, the reach and

requirements of both statutes are precisely the same."  Weixel v. Bd. of Educ. of N.Y.,

287 F.3d 138, 146 n.5 (2d Cir. 2002).

II.     **K.M.'S PSYCHOLOGICAL CONDITION**
        **AND EDUCATIONAL HISTORY**

As discussed below, the record demonstrates that K.M. suffers from a variety of psychological disorders and learning disabilities that have interfered with, inter alia, her social integration, but that she nonetheless has managed to excel in her academic subjects.

A.      **K.M.'s Diagnoses**

During the relevant time period – 1998 to 2003 – K.M. was diagnosed and treated by a variety of physicians and specialists, including psychologists, a pediatrician, a pediatric neurologist, a neuro-psychologist, and a language pathologist.  She was diagnosed with attention deficit hyperactivity disorder ("ADHD") (Def. Ex. 29 at 8), dysgraphia[1] (Def. Ex. 29 at 8; Pltf. Exs. S, JJ), generalized anxiety disorder (Def. Ex. 29 at 8; Def. Ex. 19), Asperger's syndrome (Pltf. Exs. HH at 1, JJ), and pervasive developmental disorder (Tr. At 310-14), and was found to have a moderate language-based learning disability (Pltf. Rule 56.1 Stat.¶ 29; Pltf. Ex. II) and significant processing deficits in the areas of primary visuo-spatial processing, including perception of spatial orientation, spatial tracking, spatial memory, and visuomotor integration.  (Pltf. Rule 56.1 Stat.¶ 40; Def. Ex. 25 at 11)

In July 1998, when K.M. was six years old, a psychologist – Dr. Stephen B. Silverman – diagnosed ADHD (Pltf. Ex. X; Pltf. Rule 56.1 Stat. ¶ 2).  K.M.'s pediatrician **–** Dr. Stephen Charnay – confirmed that diagnosis on August 12, 1998.  (Pltf. Ex. P; Pltf. Rule 56.1 Stat.¶ 3)

---

[1] Dysgraphia is defined as "[i]mpairment of the ability to write, usually caused by brain dysfunction or disease."  Dorland's Medical Dictionary for Health Consumers (2007), http://medical-dictionary.thefreedictionary.com/dysgraphia (last visited Feb. 1, 2010).

In September 2002, Dr. Charnay determined that K.M. was experiencing dysgraphia and linguistic difficulties and recommended a neuro-psychological evaluation. (Pltf. Ex. S)  A neurological report dated September 6, 2002, written by Dr. Robert Wolff, states that K.M.'s writing is compromised by multiple erasures and spatial irregularity (Def. Ex. 3; Pltf. Rule 56.1 Stat.¶ 17).  In November 2002, the School District referred K.M., then age 11, for evaluation by Dr. Gabrielle Stutman, a neuro-psychologist.  Dr. Stutman diagnosed ADHD, dysgraphia, generalized anxiety disorder and left visual hemianopia.[2]  (Pltf. Rule 56.1 Stat.¶ 19, Def. Ex. 29 at 8)  Her neurological examination revealed a clinically significant cognitive deficit in the "domains of visual and aural attention and response inhibition, visuo-spatial processing and response speed."  (Def. Ex. 29)  Dr. Stutman also stated that "anxiety is secondary to [K.M.'s] increasing consciousness of the negative social and academic effects of her cognitive deficits."  (Def. Ex. 29. at 7)

A school psychologist conducted a psychological evaluation of K.M. in September 2002.  The Wechsler Intelligence Scale for Children (WISC-III) test indicated that K.M. had a Verbal IQ in the 98th percentile, Performance IQ in the 34th percentile, Verbal Comprehension Index in the 96th percentile, Perceptual Organization Index in the 63rd percentile, Freedom from Distractibility in the 98th percentile, and Processing speed in the 6th percentile.  (Def. Ex. 31)

In January 2003, K.M. again saw neurologist Dr. Robert Wolff, who diagnosed K.M. with "high functioning autistic spectrum disorder of the Asperger's

---

[2]  Hemianopia is defined as "blindness in one half of the visual field of one or both eyes." Merriam-Webster's Online Medical Dictionary, http://www.merriam-webster.com/medical/hemianopia (last visited Feb. 1, 2010).

type." (Pltf. Rule 56.1 Stat.¶ 26, Pltf. Ex. HH at 1)  Thereafter, K.M.'s parents obtained a

speech-language assessment at the Center for Communication Disorders in

Poughkeepsie, New York.  The language pathologist diagnosed a "moderate language-

based learning disability" on February 19, 2003.  (Pltf. Rule 56.1 Stat.¶ 29; Pltf. Ex. II)

        While in sixth grade in February 2003, K.M. began seeing social worker

Rhonda Hauge for weekly counseling sessions.  Ms. Hauge noted that K.M. had been

experiencing "symptoms of anxiety and depression that appear to be a residual effect of

her diagnoses of Asperger's or Pervasive Developmental Disorder."  (Pltf. Ex. E)

        In March 2003, K.M. was seen for emergency psychiatric treatment at St.

Francis Hospital, where she was evaluated for "unstable mood, debilitating anxiety,

impaired attention, deficient interpersonal skills and assorted learning deficits

contributing to persistent and progressive episodes of inconsolable agitation and lability."

(Pltf. Rule 56.1 Stat.¶ 30; Def. Ex 19)  Dr. Mark Cerbone treated K.M. at that time and

summarized her condition as follows:

> [K.M.] is suffering from clinical disorders including anxiety disorder not
> otherwise specified, attention deficit disorder not otherwise specified,
> Asperger's syndrome, learning disorder not otherwise specified (including
> dysgraphia), with a differential diagnosis including consideration of other
> severe syndromes.

(Pltf. Rule 56.1 Stat.¶ 30, Def. Ex. 19)  Dr. Cerbone recommended that K.M. "receive a

formal classification as being emotionally disturbed as well as learning disabled."  (Def.

Ex. 19)

        In June 2003, Dr. Marion Rissenberg conducted a neuro-psychological re-

examination of K.M.  Dr. Rissenberg found that K.M. continued to demonstrate "general

intellectual ability in the Superior range" but found evidence of "significant processing

deficits in the areas of visuospatial processing including perception of spatial orientation, spatial tracking and spatial memory, and visuomotor integration."  (Pltf. Rule 56.1 Stat.¶ 40; Def. Ex. 25 at 11)   Dr. Rissenberg confirmed K.M.'s earlier diagnoses and stated that the results of his examination were

> consistent with specific developmental visuospatial and visuomotor (graphomotor) learning disabilities, or processing deficits, attentional and organizational deficits consistent with attention deficit hyperactivity disorder, and temperament issues including emotional sensitivity, anxiety, inflexibility, and limited social perception consistent with Asperger's syndrome.

(Def. Ex. 25, at 12)

### B.   K.M.'s Educational Record and Section 504 Accommodations

#### 1.   Academic Performance

The record reveals that although K.M. received Section 504 accommodations, she excelled academically while in public school during the 1998 through 2003 period.

In September 1997, K.M. entered Gayhead Elementary School ("Gayhead") at first grade.  Her parents expressed concerns about her attentional difficulties and the school recommended that K.M. repeat first grade.  (Pltf. Ex. LL) K.M.'s parents rejected that advice (Pltf. Ex. LL), however, and after first grade, K.M. began to excel.

In second grade, K.M. received A's in English, Social Studies and Reading, and a B in Math.  (Def. Ex. 25 at 2)  In third grade, K.M. earned A's, B's and C's throughout the year and showed strength in English, Math and Reading.  (Id. at 3)  In fourth grade, K.M. earned a B in Social Studies in the first quarter and A's in all other

academic classes throughout the year.  (Id.)  In fifth grade, K.M. earned all A's except for

a few B's in the third quarter.  (Id.)

In September 2002, K.M. entered the sixth grade at Van Wyck Junior

High School, part of the Wappingers Central School District.  Her grades ranged "from

the low-80s to mid-90s" in sixth grade.  (Def. Ex. 25 at 3)  K.M. continued to perform

well in the first quarter of seventh grade, earning high grades in English (94), Social

Studies (90), German (94), Science (86), and Math (87).  (Def. Ex. 28)  Midway through

seventh grade, however, K.M.'s parents removed her from public school and enrolled her

in the private Oakwood Friends School.  There, her grades were once again in the 80s and

90s.  (Def. Ex. 28)

### 2.   Educational Accommodations

Between 1998 and 2003, K.M. received classroom modifications and other

counseling services under a Section 504 Accommodation Plan.  The School District's

CSE, however, consistently denied K.M. eligibility for special education services under

IDEA.  (IHO Dec. at 2)

Beginning in second grade, K.M. received accommodations that included

preferential seating in the front of the classroom and two thirty-minute occupational

therapy sessions per week.  (Pltf. Ex. MM, PP)  In March of 1999, when K.M. was still in

second grade, she was moved into an "inclusion class"[3] (SRO Dec. at 2), where she

remained throughout third and fourth grade.  In June of 1999, K.M.'s Section 504

---

[3] An inclusion class consists of "both special education and general education students,
and is taught cooperatively by a general education teacher and a special education
teacher.  The goal of an inclusion class is to enable the special education students to be
placed in a regular education class the following year."  Meder v. City of New York, No.
06 Civ. 504 (JG), 2007 U.S. Dist. LEXIS 75400, at *4 n.3 (E.D.N.Y. Oct. 9, 2007).

Accommodation Plan was modified to provide for weekly counseling by a social worker in the area of behavior modification.  (Pltf. Ex. QQ)  By the 2001-02 school year, K.M.'s Section 504 Accommodation Plan included, among other things, preferential seating in the front of the classroom, the breaking down of complex instructions, untimed testing, and access to notes.  (Pltf. Ex. EEEE)  K.M. entered a regular education class in fifth grade (SRO Dec. at 2), where she earned nearly all A's.  (Def. Ex. 25 at 3)

In June 2002 – in preparation for sixth grade – the School District announced that the services K.M. would receive under her Section 504 Plan would be "significantly reduced."  She was discharged from occupational therapy, and counseling was limited to ten sessions per year.  (Def. Ex. 34; IHO Dec. at 2)  K.M.'s parents then requested that the School District conduct an educational evaluation of K.M.  (IHO Dec. at 2)  In January 2003, the School District's 504 Plan team decided that K.M. would receive additional accommodations such as "preferential seating when practical," "[i]nclusion team placement as a non-handicapped student," "adaptive testing-extended time as needed," and expanded social worker counseling in the form of six group sessions and four individual sessions over a six-month period.  (Pltf. Ex. WW)

In August 2003, in preparation for the 2003-04 school year, K.M.'s parents again requested that the School District's CSE conduct a complete evaluation of K.M. and classify her as eligible to receive special education services under IDEA.  (Def. Ex. 23)  As discussed below, the CSE rejected that request in September 2003, and determined that K.M.'s 504 Accommodation Plan was adequate to meet her educational needs.  (Def. Ex. 27)  In January 2004, K.M.'s parents removed K.M. from public school

and enrolled her in the Oakwood Friends School ("Oakwood"), a private residential

institution.  (IHO Dec. at 1)

       **C.**      **The CSE's September 2003 Denial of Classification Under IDEA**

      During the 2002-03 school year, when K.M. was eleven years old and in

sixth grade, her parents requested that she be classified as eligible for special education

services under IDEA.  On October 1, 2002, the CSE denied Plaintiffs' request, after

considering a school psychologist's report (Def. Ex. 31), teacher observations, academic

reports, hearing and vision reports, a developmental social history and medical

information. (Def. Ex. 9)  The CSE did, however, recommend that an independent neuro-

psychological evaluation be conducted (Def. Ex. 9), and in November 2002 neuro-

psychologist Dr. Gabrielle Stutman conducted that examination.  (IHO Dec. at 2)  On

December 10, 2002, the CSE reviewed Dr. Stutman's evaluation, updated teacher reports,

and the information submitted in connection with the October 1, 2002 meeting, and again

denied classification under IDEA, finding that K.M.'s disorders had no "educational

impact."  (Id. at 3; Def. Ex. 12)

      On February 4, 2003, the CSE reviewed an independent occupational

therapy evaluation of K.M., a letter from Dr. Wolff (the neurologist who had seen K.M.

on multiple occasions and determined that she had Asperger's syndrome), and an

addendum letter from Dr. Stutman.  The CSE determined once again that the reports did

not support K.M.'s classification under IDEA.  (Def. Ex. 16)

      In April 2003, after K.M.'s admission for emergency psychiatric treatment

at St. Francis Hospital, the CSE reviewed the reports concerning that admission, a

speech-language evaluation, and an occupational therapy evaluation.  (Def. Ex. 21)  The

CSE also heard from two of K.M.'s teachers.  (Id.)  The CSE again rejected classification under IDEA, noting, inter alia, that K.M. had "English in the 90 range" and "Math . . . in the 90 range."  (Def. Ex. 21)

K.M.'s parents then arranged for neuro-psychologist Marion Rissenberg to evaluate K.M.  (Dist. Ex. 25 at 7)  On September 16, 2003, the CSE reviewed Dr. Rissenberg's report, and determined that it did not support K.M.'s classification under IDEA.  As discussed above, while Dr. Rissenberg's findings indicated that K.M. – then in sixth grade – suffered from certain learning disabilities consistent with ADHD, and had "temperament issues . . . consistent with Asperger's syndrome," he also found that K.M. had "general intellectual capacity . . . in at least the 91st percentile," that her verbal IQ was "superior," that her performance IQ was "average," and that her full scale IQ was "high average."  (Def. Ex. 25 at 10)  Dr. Rissenberg also found that K.M.'s "academic skills are strong, with reading comprehension and written expression at eighth grade level and above and a strength in Math, at twelfth grade level."  (Def. Ex. At 11)  The CSE cited Dr. Rissenberg's findings in refusing to classify K.M. under IDEA. (Def. Ex. 27)

In response to the CSE's September 16, 2003 decision, K.M.'s parents demanded an impartial hearing, claiming that the CSE should have classified K.M. as eligible to receive special education services under IDEA.

## III.   **ADMINISTRATIVE PROCEEDINGS**

### A.   **The IHO's Decision**

The IHO conducted a seven-day hearing between November 20, 2003, and July 19, 2004.  In January 2004, in the middle of the IHO proceedings, K.M.'s parents unilaterally enrolled K.M. at Oakwood.  On October 12, 2004, the IHO issued a decision

holding that (1) the CSE's September 16, 2003 decision was procedurally flawed, in that the CSE had no physical exam, social history, or recent observation of the student before it when the CSE rendered its decision, as is required by 8 N.Y. Comp. Codes R. & Regs. 200.4(b)(1); (2) while the CSE had "lack[ed] information to make a valid decision on classification," the IHO had conducted a lengthy hearing and amassed a "substantial record," and therefore was well-equipped to make findings as to the "proper classification"; and (3) K.M. met the eligibility criteria for special education services under IDEA because she suffered from "an other health impairment" as defined in 34 C.F.R. § 300.8[c][9].  (IHO Dec. at 1, 4, 8-9, 14)

   In making his eligibility determination, the IHO conceded that "the undisputed facts in this record establish" that K.M. was "achieving at grade level," "was functioning at an academic level consistent with [her] ability," and "was achieving average or above average grades."  (IHO Dec. at 10)  While conceding that "K.M. has been able to achieve academic success in the District," however, the IHO held that in determining whether a child's disabilities had had an adverse effect on his or her "educational performance," 34 C.F.R. § 300.8[c][9], he was entitled to consider "non-academic skills," including "social development, physical development and management needs."  (Id. at 13)  The IHO then concluded that K.M.'s ADHD, Asperger's, chronic anxiety and other conditions had seriously impaired her social discourse and social development, and that accordingly K.M. "has needed and continues to need special education in order to benefit from the regular education."  (Id. at 9)  The IHO then went on to determine that Oakwood was an appropriate placement for K.M. and that her

parents were entitled to partial reimbursement for tuition payments made to Oakwood.[4]
(Id. at 13)

### B.      **The SRO's Decision**

The School District appealed, and on March 4, 2005, the SRO reversed the
IHO's decision.  While the SRO agreed that the CSE did not have before it the
examinations, evaluations and social history necessary to make a valid classification
decision, the SRO concluded that Plaintiffs had not established that K.M. met the
eligibility criteria necessary to receive special education services under IDEA.  (SRO
Dec. at 9)  The SRO reasoned that "the record does not support a finding that the
student's condition is adversely impacting her educational performance to the extent
special education is required," citing K.M.'s strong performance in her classes and
"achievement on standardized tests."  (Id. at 10)

With respect to the IHO's determination that K.M. should be eligible for
classification under the "other health impairment" category set forth in 34 C.F.R.
§ 300.8[c][9], the SRO concluded that "[t]o be classified as a student with an OHI, the
student's impairment must "'adversely affect the student's performance.'"  Id. (quoting
34 C.F.R. § 300.8[c][9]).  While there was evidence indicating that K.M. had "social and
emotional difficulties and areas of weaknesses," these problems had not risen to the level
"where they [were] adversely affecting her classroom performance, her ability to learn in
class, to function in her classes or to continue in school, or her ability to benefit from
regular education."  (SRO Dec. at 10)

---

[4]  The IHO denied full tuition reimbursement because of "parental overinvolvement,"
including pressure on the child to excel, and because the "the parents withdrew the child
[from public school] during portions of the [school] day in Spring 2003."  (IHO Dec. at
14)

With respect to Plaintiffs' argument that K.M. qualified for services as a student with an "emotional disturbance," see 8 N.Y. Comp. Codes R. & Regs. 200.1[zz][4], 34 C.F.R. §300.8 [c][4], the SRO determined that a finding of adverse impact on educational performance remained necessary, and that evidence of adverse impact was not present in this case.  (SRO Dec. at 11)  The SRO also determined that K.M. should not be classified as a student with "speech or language impairment," see 8 N.Y. Comp. Codes R. & Regs.200.11 [zz][11], 34 C.F.R. § 300.8 [c][11], because "while . . . the student may exhibit moderate language-based learning deficits . . . characterized by difficulty organizing and producing verbal and written narratives," these deficits did not "rise to the level of a communication disorder which would make her eligible for special education."  (SRO Dec. at 11)

Having determined that the IHO erred in holding that K.M. was eligible to receive special education services pursuant to IDEA, the SRO held that the School District was "not required to reimburse [K.M.'s parents] for the tuition costs associated with [their] daughter's placement at Oakwood for the 2003-04 school year."  (Id.)

On May 31, 2005, Plaintiffs filed this lawsuit seeking, inter alia, reversal of the SRO's decision, an award of tuition reimbursement, and compensatory and punitive damages under the Rehabilitation Act and Title II of the ADA.[5] (Cmplt. ¶¶ 40-53)

---

[5] This case was reassigned to this Court on November 17, 2008. [Docket No. 15].

## DISCUSSION

The School District does not contest that one or more of K.M.'s disorders could qualify as a disabling condition under IDEA.  Instead, Defendant argues that eligibility for special education services under IDEA requires proof that a child's condition has adversely affected his or her academic performance.  As discussed below, the federal and New York State regulations promulgated under IDEA require proof of an adverse impact on "educational performance."  Courts in this Circuit applying New York's IDEA-related regulations have uniformly interpreted this clause to require proof of an adverse impact on academic performance, as opposed to social development or integration.[6]  See C.B. ex rel. Z.G. v. Dep't of Educ. of the City of N.Y., 322 Fed. App'x 20, 21 (2d Cir. 2009) (unpublished opinion); N.C. ex rel. M.C. v. Bedford Cent. Sch. Dist., 300 F. App'x 11, 13 (2d Cir. 2008) (unpublished opinion); C.L.J. and C.J. ex rel. A.J. v. Bd. of Educ. E. Islip Union Free Sch. Dist., No. 07 Civ. 2103 (DRH), 2010 U.S. Dist. LEXIS 1371, at *17 (S.D.N.Y. Jan. 8, 2010).  No court applying New York's implementing regulations has held that a student who has excelled academically nonetheless has a right to special education services under IDEA.  Given the undisputed evidence of K.M.'s consistently superior academic performance – including evidence that she was performing far above her grade level – Plaintiffs have not demonstrated that

---

[6]  Under IDEA and its implementing regulations, states are free to issue regulations that define "educational performance" as encompassing only basic skills – as does Vermont, J.D. ex rel. J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 66 (2d Cir. 2000) – or as including more than simply academic performance – as does Maine.  Mr. I. ex rel. V. Me. Sch. Admin. Dist. No. 55, 480 F.3d 1, 11-12 (1st Cir. 2007).  States may also choose not to define this term.  As discussed below, that is the approach adopted by New York.

K.M.'s conditions had an adverse impact on her "educational performance." Accordingly, Defendants are entitled to summary judgment on Plaintiffs' IDEA claim.[7]

Defendants are also entitled to summary judgment on Plaintiffs' Rehabilitation Act and ADA claims, which arise from the same core facts underlying Plaintiffs' IDEA claim.  Despite the extensive administrative record, Plaintiffs have not pled or proffered any facts demonstrating – as they must under these statutes – that Defendants acted in "bad faith or with gross misjudgment."  See S.W. ex rel. J.W. v. Warren, 528 F. Supp. 2d 282, 290 (S.D.N.Y. 2007); see also Scaggs v. N.Y. City Dep't of Educ., No. 06 Civ. 799 (JFB), 2007 WL 1456221, at *16 (E.D.N.Y. May 16, 2007). Because Plaintiffs have not demonstrated that there is any material issue of fact as to these issues, Defendants are entitled to summary judgment.

## I.     DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' IDEA CLAIM

### A.     Standard of Review

IDEA provides that the district court shall "receive the records of the administrative proceedings; shall hear additional evidence at the request of a party; and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(B)(i)-(iii)(Apr. 29, 1999).[8]  "The level of deference due to the administrative determinations of the state educational

---

[7]  Plaintiffs argue that the SRO's determination cannot be upheld because the CSE committed several procedural violations under 8 N.Y. Comp. Codes R. & Regs. § 200.4(b) in conducting its evaluation of K.M.'s eligibility.  As discussed below, this argument fails because Plaintiffs have not demonstrated that they were prejudiced by the CSE's procedural errors.

[8]  All references to federal statutes and regulations in this section are to the versions that were in effect on September 16, 2003 – the day K.M. requested the formal evaluation for special education that led to the instant litigation.  See J.D. ex rel. J.D., 224 F.3d at 62 n.1.

agency depends on what type of determination a district court is reviewing." Eschenasy v. N.Y. City Dep't of Educ., 604 F. Supp. 2d 639, 646 (S.D.N.Y. 2009).

        Where the adequacy of an IEP is at issue, courts perform a "circumscribed" review based on a "preponderance of the evidence" standard, and "give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 252 (2d Cir. 2009) (quotations omitted).  Where, as here, the issue is "whether the school district properly classified [a student] as an individual with or without a disability," less deference is due to the administrative proceedings because "the district court [is] as well-positioned as the state administrative officials to determine [the student's] eligibility." Muller ex rel. Muller, 145 F.3d at 102.  "In other words, while required to defer to the state authority's educational judgments, the Court is not limited merely to reviewing the reasoning of the agency decisionmakers, and remanding for further proceedings if it finds legal flaws in that reasoning." Bd. of Educ. of City Sch. Dist. of City of N.Y. v. Gustafson, No. 00 Civ. 7870 (GEL), 2002 WL 313798, at *3 (S.D.N.Y. Feb. 27, 2002) (citing Muller ex rel. Muller, 145 F.3d at 102).  "[W]here the question is one of statutory eligibility, the district court is 'free to consider the issue of [the student]'s statutory eligibility de novo.'" Eschenasy, 604 F. Supp. at 646-47 (quoting Muller ex rel. Muller, 145 F.3d at 101-02) (alterations in Eschenasy).

    **B.**    **The SRO Properly Determined that K.M. Is Not Eligible for Special Education Services Under IDEA**

        The purpose of IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education

and related services designed to meet their unique needs and prepare them for

employment and independent living."  20 U.S.C. § 1400(d)(1)(A) (June 4, 1997).  The

statute defines "a child with a disability" as a child with:

> mental retardation, hearing impairments (including deafness), speech or
> language impairments, visual impairments (including blindness), serious
> emotional disturbance (hereinafter referred to as "emotional disturbance"),
> orthopedic impairments, autism, traumatic brain injury, other health
> impairments, or specific learning disabilities; and who, by reason thereof,
> needs special education and related services.

 20 U.S.C. § 1401(3)(A)(i)-(ii) (June 4, 1997).  Plaintiffs argue that K.M. should be

classified under IDEA as having an "other health impairment[]"or a "serious emotional

disturbance."  (Pltf. Br. at 8-11)

Federal regulations promulgated under IDEA define "an other health

impairment" as:

> having limited strength, vitality or alertness, including a heightened
> alertness to environmental stimuli, that results in limited alertness with
> respect to the educational environment, that –
>
> (i) Is due to chronic or acute health problems such as asthma, attention
> deficit disorder or attention deficit hyperactivity disorder, diabetes,
> epilepsy, a heart condition, hemophilia, lead poisoning, leukemia,
> nephritis, rheumatic fever, and sickle cell anemia; and
>
> (ii) Adversely affects a child's educational performance.

34 C.F.R. § 300.7(9) (March 12, 1999) (emphasis added).  New York's regulations are

the same in all material respects.  8 N.Y. Comp. Codes R. & Regs. § 200.1(zz)(10).

The regulations promulgated under IDEA define an "emotional

disturbance" as:

> (i) a condition exhibiting one or more of the following characteristics over a long
> period of time and to a marked degree that adversely affects a child's educational
> performance:

(A) An inability to learn that cannot be explained by intellectual, sensory, or health factors.

(B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.

(C) Inappropriate types of behavior or feelings under normal circumstances.

(D) A general pervasive mood of unhappiness or depression.

(E) A tendency to develop physical symptoms or fears associated with personal or school problems.

(ii) The term includes schizophrenia. The term does not apply to children who are socially maladjusted, unless it is determined that they have an emotional disturbance

34 C.F.R. § 300.7(4) (March 12, 1999) (emphasis added).  New York's regulations are nearly identical.  See 8 N.Y. Comp. Codes R. & Regs. § 200.1(zz)(4).

IDEA does not define the term "needs special education," and the federal and New York implementing regulations do not define "adverse effect on educational performance."  See J.D. ex rel. J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 66 (2d Cir. 2000) ("[N]either the IDEA nor the federal regulations define the terms 'need special education' or 'adverse effect on educational performance,' leaving it to each State to give substance to these terms."); C.L.J. and C.J. ex rel. A.J., 2010 U.S. Dist. LEXIS 1371, at *17 ("[T]he New York regulations do not define 'educational performance.'").  During the administrative proceedings, the IHO and SRO disagreed as to whether K.M.'s condition adversely affected her "educational performance."  (IHO Dec. at 11; SRO Dec. at 10)  The IHO interpreted "educational performance" to include "non-academic" skills and found that these skills were adversely affected by K.M.'s conditions.  (IHO Dec. at 10)  The SRO focused on K.M.'s academic performance, including her grades and scores on

20

standardized tests, and found no adverse impact.  With respect to non-academic skills, the SRO acknowledged that K.M. has "social and emotional difficulties and areas of weakness," but found that "there is no evidence that these have risen to the level where they are adversely affecting her classroom performance, her ability to learn in class, to function in her classes or to continue in school, or her ability to benefit from a regular education."  (SRO Dec. at 10)

Accordingly, this Court must determine whether the phrase "adversely affects a child's educational performance" found in both the definition of (1) "an other health impairment," 34 C.F.R. § 300.7(9) (March 12, 1999); and (2) "emotional disturbance," 34 C.F.R. § 300.7(4) (March 12, 1999), encompasses non-academic considerations – such as social integration – or whether "educational performance" should be gauged solely by assessing academic performance.  Two recent Second Circuit decisions – albeit summary orders – and district court authority indicate that proof of an adverse impact on academic performance is a prerequisite for eligibility for special education services under IDEA and New York's implementing regulations.

In C.B. ex rel. Z.G. v. Dep't of Educ. of the City of N.Y., 322 Fed. App'x 20, 21 (2d Cir. 2009), a highly analogous case, the IHO found that a student with ADHD and bipolar disorder qualified for special education services under IDEA as "other health impaired."  The SRO reversed, finding the child not eligible for benefits because she was performing well academically.  C.B. ex rel. Z.G., 322 Fed. App'x at 21.  The record included evidence that – as a result of her conditions – the student was late to school or absent approximately 50% of the time and had suicidal ideation.  See Transcript of Oral Argument at 6 & 25, C.B. ex rel. Z.G., No. 07 Civ. 3419 (AKH) (S.D.N.Y. Feb. 2, 2008).

The Second Circuit framed the issue on appeal, however, as "whether [plaintiff's] experience of those conditions adversely impacted her educational performance."  Id. at 21-22.  After finding that the student "continuously performed well," "tested above grade-level," and that her "educational performance has not suffered," the Court held that "[t]he evidence on the record is insufficient to show that [the child] has suffered an adverse impact on her educational performance," and that accordingly Plaintiff had not established the child's eligibility for services under IDEA.  Id. at 22.

Similarly, in N.C. ex rel. M.C. v. Bedford Cent. Sch. Dist., 300 F. App'x 11, 13 (2d Cir. 2008) (unpublished opinion), the plaintiff parents argued that their son suffered from major depression, and challenged an SRO's determination that their son was not a "child with a disability" under IDEA because he did not suffer from a "severe emotional disturbance" under 8 N.Y. Comp. Codes R. & Regs. § 200.1(zz)(4).  The Second Circuit concluded that even if plaintiffs could establish that their son was emotionally disturbed under New York's regulations, he still would not qualify for special education services, because there was "insufficient evidence that [the child's] educational performance was adversely affected by any such condition."  N.C. ex rel. M.C., 300 F. App'x at 13.  In reaching this determination, the Court noted that the child "did not fail any of his classes" and that a slight decline in his grade point average could be attributed to his acknowledged drug use rather than to depression.  See id.

Lower court decisions also indicate that adverse effect on "educational performance" must be determined by reference to academic performance.  In C.L.J. and C.J. ex rel. A.J., 07 Civ. 2103 (DRH), 2010 U.S. Dist. LEXIS 1371, at *17 (E.D.N.Y. January 8, 2010), the parents of a child suffering from ADHD and Asperger's syndrome

appealed an SRO's decision that their child did not qualify as a "child with a disability" because his conditions had not adversely impacted his educational performance. <u>See C.L.J. and C.J. ex rel. A.J.</u>, 2010 U.S. Dist. LEXIS 1371, at *9-10.  The child was disruptive, impulsive, and hyperactive in the classroom, and exhibited inappropriate behaviors such as touching and hitting other students, using improper language, and throwing objects.  He also had difficulty socializing with his peers.  The child nonetheless was performing well academically.  <u>Id</u>. at *3-10.  As here, the parents argued that "'educational performance' should not be so narrowly construed as to encompass solely academics," and "must include reference to the child's physical, emotional, and social needs."  <u>Id.</u> at *17, 15.

The District Court, however, determined that "the import of [<u>N.C.</u> and <u>C.B.</u>]" is that

> a child's "difficulties with [his or her] disorder," which presumably include emotional and behavioral troubles, are not the proper measure of "educational performance."  Rather, "educational performance" must be assessed by reference to academic performance which appears to be the the principal, if not only, guiding factor.

<u>Id.</u> at 24.  Because the child "was performing at average to above average levels in the classroom and was progressing academically," the Court concluded that his condition "was not affecting his educational performance," and that accordingly the child was not eligible for services under IDEA.  <u>Id.</u> at *31.

Finally, in <u>Laura & Louis Carswell v. Catskill Cent. Sch. Dist.</u>, No. 03 Civ. 878 (FJS) (N.D.N.Y. Jan. 31, 2005), the student had been diagnosed with ADHD and Tourette syndrome (Pltf. Br. at 58) but was a "good student" who did well on standardized tests and received above-average grades.  <u>See</u> No. 03 Civ. 878 (FJS)

(N.D.N.Y. Jan. 31, 2005).  As with K.M., there was evidence that the student had "poor self-esteem," had "poor knowledge and judgment in social interactions," was a "loner," and "seemed to lack peer friendships."  Id. at 9-10.  Nevertheless, the court concluded that while "[t]he record shows that [the student] faced some difficulties at school," "given his generally strong school record and the lack of any indication in the record that his condition has impeded his ability to learn and to progress academically, it does not appear that these difficulties have adversely affected his educational performance."  Id. at 10.

The teaching of these cases is that this Court must look to K.M.'s academic performance in order to assess whether she is eligible for special education services under IDEA.  Here, as described above, there is overwhelming evidence that K.M. was a high performing student throughout her public school years.  In sixth grade, K.M. earned A's and B's (Def. Ex. 25), and in seventh grade, before her parents enrolled her in Oakwood, she was continuing to excel, as evidenced by her 90.5 grade average. (Def. Ex. 28; Pltf. Ex. LL)  Indeed, the neuro-psychologist retained by K.M.'s parents to evaluate her at the outset of seventh grade determined that her "academic skills are strong, with reading comprehension and written expression at eighth grade level and above and a strength in Math, at twelfth grade level."  (Def. Ex. At 11)

Plaintiffs admit that "[t]his case is not about a child whose disability inhibits academic progress" (Pltf. Br. at 5), but contend that K.M.'s significant social and emotional problems – including difficulty interacting with peers, anxiety, and hyperactivity – render her eligible for services under IDEA.  The case law cited above,

however, indicates that because K.M.'s conditions have not adversely affected her academic performance, she does not qualify for services under IDEA.[9]

**B.    The CSE's Procedural Violations Did Not
Deny K.M. a Free and Appropriate Public Education**

Under 8 N.Y. Comp. Codes R. & Regs. § 200.4(b), an initial evaluation or a reevaluation of a student must include:  (1) "a physical examination"; (2) "an individual psychological evaluation"; (3) "a social history"; (4) "an observation of the student in the student's learning environment"; and (5) "other appropriate assessments or evaluations." 8 N.Y. Comp. Codes R. & Regs. § 200.4(b)(1)(i)-(v).  Here, it is undisputed that the CSE – when it refused to classify K.M. as eligible for special education services on September 16, 2003 – only considered K.M.'s June 2003 neuro-psychological evaluation and did not have before it a physical examination, a social history, or observations of K.M. in the classroom.  (Def. Ex. 27)  Both the IHO and SRO agreed that the CSE failed to meet New York's procedural requirements, but nevertheless found that they were able to determine whether to classify K.M. as disabled based on the record before them.  (IHO Dec. at 9; SRO Dec. at 9)  Plaintiffs argue, in conclusory fashion, that the CSE's procedural violations amount to a denial of a free and appropriate public education.  (Pltf. Br. at 11; Cmplt. ¶ 42)  The Court disagrees.

---

[9]  This conclusion is consistent with IDEA's statutory purpose, which is to provide "a basic floor of opportunity" and not to maximize each student's potential.  Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley, 458 U.S. 176, 198 (1982). See also Rowley, 458 U.S. at 186 ("[T]he language of . . . [IDEA] contains no requirement . . . that States maximize the potential of handicapped children commensurate with the opportunity provided to other children."); C.L.J. and C.J. ex rel. A.J., 2010 U.S. Dist. LEXIS 1371, at *26-27 ("Plaintiffs' arguments that [the child's] 'educational performance' has been hampered by his emotional and behavioral problems such that he is unable to reach his maximum academic potential . . .has been rejected by the Supreme Court." (citing Rowley, 458 U.S. at 186)).

Contrary to Plaintiffs' argument, not every procedural violation during a

CSE evaluation constitutes a denial of a free and appropriate public education:

> In cases reviewing individualized education programs ("IEPs") formulated pursuant to the IDEA . . . we have made clear that "[not] every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA." Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381, 74 Fed. Appx. 137 (2d Cir. 2003).  Such errors will not negate the adequacy of an IEP where the child's education has not been affected and the parents have not been deprived of meaningful participation in the process. . . . This court has adopted a similar approach when evaluating procedural errors in a case assessing a student's eligibility for IDEA coverage.  See J.D. ex rel. J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 68-70 (2d Cir. 2000) (finding that procedural errors did not entitle plaintiff to relief because parties were given a meaningful opportunity to present evidence and because child was not wrongfully denied a FAPE).

N.C. ex rel. M.C., 300 F. App'x at 13-14.  Applying this standard, the N.C. ex rel. M.C.

court went on to examine the CSE's procedural shortcomings, which included a failure to

provide the parents "access to school records," a failure to reconvene to consider a new

letter from a doctor who had evaluated the child, and a failure to conduct new evaluations

of the child for the upcoming school year.  See id.  The Court concluded that, despite

these alleged procedural errors, the plaintiffs had "failed to demonstrate that the CSE's

procedures caused them any prejudice."  Id. at 14.

Similarly, in J.D. ex rel. J.D. v. Pawlet Sch. Dist., 224 F.3d 60 (2d Cir.

2000), the issue was "whether an academically gifted child with an emotional-behavioral

disability is eligible for special education under the IDEA and the corresponding

Vermont regulations."  Id. at 65.  Plaintiff argued that the state agency's failure to render

a decision within forty-five days of his request for a due process hearing denied his child

a free and appropriate education.  See id. at 69.  The Second Circuit noted that despite the

procedural error "relief is warranted only if we find, based on our independent review of

the record, that the forty-five-day rule violation affected [the child's] right to a free
appropriate public education." Id. at 69.  The court concluded that the student "was
properly found to be ineligible for special education on account of his above-average
basic skills; a fortiori he was not denied a free appropriate public education . . . ." Id. at
70.

    Here, Plaintiffs have not offered any evidence that they were prejudiced
by the fact that the CSE considered only the report recently prepared by the parents'
neuro-psychologist.  The CSE was already intimately familiar with the facts of K.M.'s
case, and had reviewed numerous reports regarding her condition in the year prior to the
September 16, 2003 CSE meeting.

    The CSE met at least five times during the 2002-03 period to consider
K.M.'s classification and denied classification each time because of K.M.'s superior
academic performance.  Meetings concerning K.M.'s classification took place on:  (1)
October 1, 2002 (Def. Ex. 9); (2) December 10, 2002, to review a report from Dr.
Stutman (Def. Ex. 12); (3) February 3, 2003, to review an occupational therapist's
evaluation, a letter from Dr. Wolff and an addendum letter from Dr. Stutman (Def. Ex.
16); (4) April 8, 2003, to review an emergency psychiatric consultation by Dr. Cerbone, a
speech language evaluation, and an occupational therapy report (Def. Ex. 21); and (5)
September 16, 2003, to consider Dr. Rissenberg's report.  At the October 2002,
December 2002, and February 2003 meetings, the CSE considered – in addition to the
specialists' reports – a full panoply of records, including a psycho-educational report, a
developmental social history, medical records, academic records, hearing and vision
reports, and teacher observations.  (Def. Exs. 9, 12, 16)  Dr. Rissenberg's report – which

was the impetus for the September 16, 2003 meeting – merely confirmed the CSE's

previous finding that K.M. was performing at an extremely high academic level.

       In sum, Plaintiffs have not demonstrated that they were prejudiced in any

way by the CSE's procedural violations, and accordingly these violations provide no

basis for this Court to grant them relief.

## II.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' REHABILITATION ACT AND ADA CLAIMS

       Plaintiffs argue that Defendants' "refusal to allow for [K.M.] to receive

necessary services and accommodations in 2002-03 under an IEP" warrants relief under

Section 504 of the Rehabilitation Act and Title II of the ADA. (Pltf. Br. at 14)

       "Both the Rehabilitation Act and the ADA protect disabled persons from

discrimination in the provision of public services." Weixel, 287 F.3d at 146.  Section 504

of the Rehabilitation Act provides:

> No otherwise qualified individual with a disability in the United States
> . . . shall, solely by reason of her or his disability, be excluded from the
> participation in, be denied the benefits of, or be subjected to
> discrimination under any program or activity receiving Federal financial
> assistance.

29 U.S.C. § 794 (Jan. 8, 2002).  Similarly, Title II of the ADA states:

> [N]o qualified individual with a disability shall, by reason of such
> disability, be excluded from participation in or be denied the benefits of
> the services, programs, or activities of a public entity, or be subjected to
> discrimination by any such entity.

42 U.S.C. § 12132 (July 26, 1990).  "Because Section 504 of the Rehabilitation Act and

the ADA impose identical requirements," this court will analyze these claims in tandem.

See Rodriguez v. City of N.Y., 197 F.3d 611, 618 (2d Cir. 1999).

       Federal regulations promulgated under § 504 require that a public school

> provide a free appropriate public education to each qualified handicapped
> person who is in the [school district's] jurisdiction, regardless of the nature
> or severity of the person's handicap.

34 C.F.R. § 104.33(a).  An "appropriate education" means:

> regular or special education and related aids and services that (i) are
> designed to meet individual educational needs of handicapped persons as
> adequately as the needs of nonhandicapped persons are met and (ii) are
> based upon adherence to procedures that satisfy [§ 504 implementing
> regulations].

34 C.F.R. § 104.33(b)(1).  Federal regulations

> express a preference for educating qualified persons with disabilities "in
> the regular educational environment . . . unless it is demonstrated . . . that
> the education of the person in the regular environment with the use of
> supplementary aids and services cannot be achieved satisfactorily."

J.D. ex rel. J.D., 224 F.3d at 71 (quoting 34 C.F.R. § 104.34(a)).

In order to show a violation of Section 504 or the ADA in the context of

providing an education to a child with disabilities, a plaintiff must show that a school

district "acted with bad faith or gross misjudgment."  See Pinn v. Harrison Cent. Sch.

Dist., 473 F. Supp. 2d 477, 483 (S.D.N.Y. 2007) ("Where a plaintiff asserts [a claim

under the Rehabilitation Act for] denial of a free appropriate public education ('FAPE')

as required by IDEA, plaintiffs must demonstrate bad faith or gross misjudgment."); S.W.

ex rel. J.W., 528 F. Supp. 2d at 290 ("[C]ourts have considered Section 504 claims in

conjunction with IDEA claims and determined that plaintiffs can rely on Section 504 to

claim that they are denied access to a free appropriate education . . . if they can show that

defendants acted with bad faith or gross misjudgment in the administration of disability

services."); see also Scaggs, 2007 WL 1456221, at *16 (applying the "gross

misjudgment" standard to a Section 504 claim and an ADA claim).

Plaintiffs' entire argument concerning their Section 504 and ADA claims

is as follows:

> [t]here are triable issues of fact precluding a grant of summary judgment
> on the Section 504 and Title II claims with respect to the 2003-2004
> school year.  The defendants knew [K.M.] was disabled – not just ADHD,
> but developmentally (and socially) disadvantaged.  This put her in an
> obviously inferior position to [her] more able peers and left her vulnerable
> to social isolation, anxiety and depression.  Her mother's efforts to bring
> [K.M.'s] problems [to] the defendants' attention was to no avail.  Plaintiffs
> herein argue there is a triable issue of fact with regard to their non-IDEA
> claims and this Court is asked to grant them an opportunity to be heard on
> this claim should eligibility under IDEA be declared unavailable to them.

(Pltf. Br. at 17)  Plaintiffs do not explain what action or inaction on the part of the School

District constituted bad faith or gross misjudgment, and cite no evidence in support of

their conclusory assertions, which are not sufficient to create a triable issue of fact with

regard to Plaintiffs' Section 504 and ADA claims.  See Bickerstaff v. Vassar College,

196 F.3d 435, 452 (2d Cir. 1999) ("Statements that are devoid of any specifics, but

replete with conclusions, are insufficient to defeat a properly supported motion for

summary judgment.").

While Plaintiffs argue that the CSE should have classified K.M. as eligible

to receive special education services, merely asserting that the District failed to

appropriately classify a child, without any evidence of bad faith or gross misjudgment, is

not sufficient to defeat summary judgment:

> Plaintiffs['] Rehabilitation Act claims are, in actuality, merely
> restatements of their IDEA claims – that Defendant failed to appropriately
> classify [the child].  Summary judgment is therefore appropriate.

Pinn, 473 F. Supp. 2d at 484 (citing Zahran, 306 F.Supp.2d at 213 (N.D.N.Y. 2004)

(dismissing Section 504 claims because they were "substantially the same as . . . the

IDEA claim" and were "essentially challenges to the program itself, not [to] any type of

discriminatory decision[]")).

Here, the overwhelming uncontroverted evidence shows that K.M.'s academic progress in public school was exemplary. There is no basis to find that the School District's accommodations were unreasonable, much less that Defendants acted in bad faith or with gross misjudgment. Here, as under IDEA, a School District's accommodations need not be optimal:

> § 504 does not require a public school district to provide students with disabilities with potential maximizing educations, only reasonable accommodations that give those students the same access to the benefits of a public education as all other students.

J.D. ex rel. J.D., 224 F.3d at 71. It is undisputed that from second grade through seventh grade the School District offered accommodations to K.M. that permitted her to succeed academically and that gave her "the same access to the benefits of a public education as all other students." Id. Nothing more is required.[10]

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment [Docket No. 13] is GRANTED, and Plaintiffs' motion for partial summary judgment [Docket No. 11] is DENIED. The Clerk of the Court is directed to close this case.

Dated: New York, New York
February 9, 2010

SO ORDERED.

Paul G. Gardephe
United States District Judge

---

[10] The Rehabilitation Act and ADA claims against Powell are also dismissed on the separate ground that individuals cannot "be named as defendants in ADA or Rehabilitation Act suits in their official or representative capacities." Sutherland v. N.Y. State Dep't of Law, No. 96 Civ. 6935 (JFK), 1999 WL 314186, at *7 (S.D.N.Y. May 19, 1999).